IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs April 3, 2018 at Jackson

**STATE OF TENNESSEE v. MACK MANDRELL LOYDE, AKA
MANDREL LOYDE, AKA MICHAEL LOYDE**

**Appeal from the Criminal Court for Davidson County
No. 2013-A-430      Seth W. Norman, Judge**

_____

**No. M2017-01002-CCA-R3-CD**

_____

The defendant, Mack Mandrell Loyde, was convicted of aggravated burglary, aggravated robbery, and employing a firearm during the commission of a dangerous felony. The trial court sentenced the defendant as a career offender for the aggravated burglary and employing a firearm convictions, and imposed fifteen-year sentences for each. For the aggravated robbery conviction, the trial court sentenced the defendant as a repeat violent offender to life without parole. On appeal, the defendant argues the evidence was insufficient to support his convictions. The defendant also challenges the trial court's sentencing as to his status as a repeat violent offender and resulting life sentence without the possibility of parole. Following our review, we affirm the trial court's application of the repeat violent offender statute to the defendant's aggravated robbery conviction and the trial court's determination as to the sufficiency of the evidence for the three convictions, but remand the case to the trial court for a hearing on the matter of sentencing as to Counts 1 and 3.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed in
Part and Reversed in Part; Case Remanded**

J. ROSS DYER, J., delivered the opinion of the court, in which D. KELLY THOMAS, JR. and ROBERT L. HOLLOWAY, JR., JJ., joined.

Ryan C. Caldwell, Nashville, Tennessee, for the appellant, Mack Mandrell Loyde.

Herbert H. Slatery III, Attorney General and Reporter; Courtney N. Orr, Assistant Attorney General; Glenn Funk, District Attorney General; and Dan Hamm and Vince Wyatt, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

*I.      Trial*

This case arises from the aggravated robbery and burglary of the victim, William Covington, on September 22, 2012. For his participation in the crimes, the defendant was charged with aggravated burglary, aggravated robbery, and employing a firearm during the commission of a dangerous felony. Tenn. Code Ann. §§ 39-13-402; 39-14-403; 39-17-1324(b). After hiring initial trial counsel, the trial court subsequently appointed four other attorneys to the defendant's case after each previously appointed attorney withdrew. As a result, the defendant proceeded to trial on February 22, 2016 with his fifth attorney. At trial, the State presented the following facts for the jury's review.

The victim testified that he was "drinking some beer" with Brandy Oldaker at his apartment in Donelson, Tennessee, on the evening of September 22, 2012. After he and Ms. Oldaker "fooled around for a little bit," the victim "passed out from whatever was given to [him]." When he awoke, the victim was "tied or bound . . . face down in [his] own couch," and Ms. Oldaker was gone. The victim explained, "when I tried to get up I got a knee put into my back and a gun put to the back of my head. Someone stated, '[d]on't f***ing move or I will blow your head off.'" The victim admitted he did not see the gun that was placed on the back of his head, but he believed it was a revolver due to his military training. While still bound on the couch, he heard "two to three males talking about hit[ting] the back of the house."

After the men left his apartment, the victim called 9-1-1 at approximately 11:30 p.m. When officers arrived, they removed the zip ties binding the victim's arms and legs, and secured the apartment. The victim realized "[t]here were multiple firearms missing." Specifically, the victim testified a 12-gauge shotgun, an AK-47, and a .22 long rifle were taken from his apartment along with his wallet, two computers, and "some tablets." The victim's wallet contained his debit and credit cards and his military ID. He believed the value of the stolen items totaled over $15,000. The victim stated a camera installed above his front door had been knocked to the ground during the robbery, noting it did not record any of the events of September 22, 2012. Additionally, during his testimony, the victim reviewed photographs of his apartment and the camera which were entered into evidence. The victim's shotgun, along with "all of the rounds that were in the shotgun and on the butt cuff that night," and a photograph of the same were entered into evidence. The victim also identified his military ID and a Hewlett Packard notebook as items taken during the crimes, both were entered into evidence.

During cross-examination, the victim testified that Ms. Oldaker knows the defendant and she may have put something in his drink to allow for the crimes. He told

police officers of his suspicions and, according to the victim, officers "actually arrested [Ms. Oldaker] that night on unrelated charges." Regarding the investigation, the victim stated he remained in the parking lot of his apartment complex while officers searched his apartment. However, at one point, officers "asked [the victim] to come back in the apartment . . . to show them where something was located that was taken." While inside, the victim saw officers dust his coffee table, front door, and bedroom door for fingerprints.

Amber Norris, the defendant's ex-girlfriend, then testified. On the night of September 22, 2012, she locked the defendant out of her apartment after he left to "go to Walmart and some things like that" and did not return before midnight. The next morning, she "stepped on a barrel of some sort of a weapon" as she got out of bed. In doing so, she "knew that something was off," but went to the bathroom to get ready for work. While in the bathroom around 5:30 a.m., Ms. Norris saw the defendant enter her apartment through the balcony door carrying a duffle bag, a shotgun, and a "toboggan with the eye holes in it." Ms. Norris saw a handgun inside the defendant's duffle bag and saw a check with "[t]he name William Covington" sitting on her coffee table. Ms. Norris identified the toboggan the defendant wore on the morning of September 23, 2012, the handgun she saw inside the defendant's duffle bag, and the shotgun the defendant was holding when he entered her apartment as exhibits at trial.

When Ms. Norris left her apartment, she called the police to inform them that "something was not right . . . and [she] did not want to be involved in it." Ms. Norris worried she would be linked to the defendant's criminal activity because he drove her car the evening of September 22, 2012 and "he brought stuff back to [her] apartment." After explaining the situation to several officers, they escorted Ms. Norris back to her apartment where she unlocked the door and then waited outside. When officers entered her apartment, they found a woman, Meganne Ball, inside who Ms. Norris did not know.

Meganne Ball testified the defendant invited her to what she believed to be his deceased mother's apartment for breakfast on the morning of September 23, 2012. She knew the defendant because he frequented the Walmart store where she worked. After finishing her shift around 7:00 a.m., Ms. Ball drove to Ms. Norris's apartment where she and the defendant took a nap. The defendant left to run an errand, and while he was gone, police officers entered the apartment and searched her. Upon his return, officers arrested the defendant outside Ms. Norris's apartment.

Agent Stewart participated in the arrest of the defendant. He read the defendant his *Miranda* rights, and "[i]mmediately after *Miranda* [the defendant] was like, I know I'm being arrested, I was just the lookout, I was just the lookout." The defendant continued, stating he drove "Kevin and Bryan" in a Honda Accord to the scene of the

robbery, but he did not go inside the apartment. Rather, the defendant maintained he served as a lookout for the two who committed the robbery. The defendant told Agent Stewart he received the shotgun, bankcards, military ID, and tablet as payment for his involvement in the crimes. The defendant's statements were not recorded.

Agent Stewart and Officers Caleb Foster and Kenneth Wolfe searched Ms. Norris's apartment. Agent Stewart discovered a "shotgun under the bed in [the] bedroom, there was a military ID belonging to William Covington that was found in the living room, a backpack containing a ski mask, and a small computer." He also found a handgun under Ms. Norris's bed. Agent Stewart identified the victim's shotgun, military ID, and tablet, along with the ski mask and handgun as items connected to the victim's robbery and found at Ms. Norris's apartment.

Officer Foster's "objective was to locate the defendant and take him into custody." During a protective sweep of Ms. Norris's apartment, Officer Foster "did not locate [the defendant] but as part of the process [he] looked under the bed and [he] observed a shotgun and rusty revolver under the bed." While still inside Ms. Norris's apartment, Officer Foster looked outside the window and saw Agent Stewart "with a gentleman on the ground at gunpoint." He ran outside to witness Officer Heimback arrest and search the defendant as Agent Stewart read the defendant his *Miranda* rights.[1] Officer Foster testified, "[a]fter his *Miranda* [r]ights had been read the defendant made an excited utterance that he knows he's going to jail for agg[ravated] robbery." At the time, Officer Foster was "under the impression that [the defendant] might have been involved with a burglary and that's the reason why we were out there, items that he probably took in a burglary were in [Ms. Norris's] apartment." Officer Foster heard the defendant again state he "was going to jail for agg[ravated] robbery," and he also "overheard the defendant tell [Agent Stewart] he was only the lookout for the robbery."

Officer Wolfe assisted in "taking photos and collecting evidence" at Ms. Norris's apartment. At trial, he identified photographs of a shotgun found under "one of the beds at the apartment." He also identified a photograph depicting a shotgun, a handgun, and a box of ammunition found underneath Ms. Norris's bed. During his investigation, Officer Wolfe saw the victim's military ID inside Ms. Norris's apartment.

Separately, Sharon Tilley processed the victim's apartment on September 23, 2012. Her duties "as a crime scene tech [were] to identify, document, collect, and preserve evidence at [the] crime scene." In doing so, Investigator Tilley processed the front door, the camera found near the front door, and the bedroom door for latent fingerprints. The fingerprints lifted from the scene matched those of the victim. Though

---

[1] Officer Heimback did not testify at trial.

she tested the defendant's prints against those lifted from the crime scene, a positive identification was not made. Investigator Tilley admitted she did not process the coffee table "where the zip tie was found," the surfaces in the kitchen, or the backdoor during her investigation of the victim's apartment. In explaining her decision as to what items she would process for fingerprints, Investigator Tilley stated:

> How many items are processed is dependent upon the scene and what kind of items they are. I know in this case from my knowledge I was briefed that the door had been entered and the weapons, a laptop tablet, and a [note]book had been taken. From my experience with those types of items you wouldn't necessarily need to handle a lot of items in order to pick up a [note]book and/or unplug it and take it with you. Typically from my experience if that item is taken then that is what is handled, they took it with them and the prints with them on the item.

The investigating officers acknowledged they did not test all available surfaces or items for fingerprints, nor did they search the defendant's cell phone after his arrest.

The defendant offered no evidence at the close of the State's proof. Subsequently, the jury found the defendant guilty of aggravated burglary, aggravated robbery, and employing a firearm during the commission of a dangerous felony.

## II. Sentencing Hearing

At the defendant's sentencing hearing, the State offered certified copies of the defendant's prior aggravated robbery convictions from Shelby County Criminal Court into evidence, along with the sentencing report. The State then presented evidence from Cindy Diedrickson and Corporal Michael Byers who were each assaulted by the defendant during his incarceration. Ms. Diedrickson served as the medical observation officer for the jail when she came into contact with the defendant. She explained he threw "a milky red substance" on her while he was in the shower. At the time, the defendant stated the substance "was semen and blood." She stated the incident "still impacts [her]." Corporal Byers testified the defendant assaulted him twice as he observed the defendant while he was on "suicide status." The defendant threw "a cup of urine and feces" at him, and on a separate occasion, the defendant "spat in [his] face." Finally, the State offered testimony from Alicia Covington, the victim's mother. Ms. Covington testified to the severe impact the crimes have had on the victim, and read a letter into the record detailing the same.

The defendant then testified. He maintained his innocence, stating "I can't be sorry for something that I – a crime I didn't commit." The defendant argued the State's

notice regarding his status as a repeat violent offender "doesn't meet the requirements" because "it doesn't state prior incarceration dates." However, the defendant admitted to having two prior aggravated robbery convictions. He stated: "The first case was in 1997 and that, like I said, it involved different individuals but it was one -- one case, one sentence. The second one was in 2012 -- well, 2001, it was one incident, one conviction." During cross-examination, the defendant admitted he received an eight-year sentence for the January 24, 1997 aggravated robbery convictions, and he then served a separate sentence for the April 25, 2002 aggravated robbery conviction. Finally, Charles Tucker testified that he mentored the defendant for approximately two years through his work in prison ministry. He believes the defendant likely has mental issues and suffered from a "troubled childhood."

Upon its review of the evidence, the trial court determined the defendant was a repeat violent offender and imposed a life sentence without the possibility of parole for his aggravated robbery conviction. The trial court failed to pronounce sentences for the aggravated burglary and employing a firearm during the commission of a dangerous felony convictions. However, the judgment forms reflect the imposition of fifteen-year sentences for each conviction. The defendant then filed a motion for new trial challenging the sufficiency of the evidence and his classification as a repeat violent offender. The trial court denied the defendant's motion for new trial, and this timely appeal followed.

## ANALYSIS

On appeal, the defendant challenges the sufficiency of the evidence as to his three convictions, arguing "the officers and crime scene investigators involved failed to pursue potential leads, properly preserve evidence, and failed to timely document their work, resulting in [the defendant's] conviction[s]." The defendant also challenges the trial court's imposition of a life sentence without the possibility of parole for his aggravated robbery conviction, arguing the State failed to properly provide notice of its intent to seek enhanced sentencing for the defendant as a repeat violent offender. In support of this argument, the defendant also claims the trial court failed to hold the defendant's trial within 180 days of arraignment as required by the repeat violent offender statute. Tenn. Code Ann. § 40-35-120 (i). In contrast, the State asserts the evidence was sufficient to support the defendant's three convictions, and that he was properly sentenced as a repeat violent offender pursuant to its timely and sufficient notice of intent to seek enhanced sentencing. The State also argues any delay between his arraignment and trial existed because of the defendant's actions. Upon our review of the record, we agree with the State and conclude the defendant is not entitled to any relief.

I.     *Sufficiency of the Evidence*

When the sufficiency of the evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see also* Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); *State v. Evans*, 838 S.W.2d 185, 190-92 (Tenn. 1992); *State v. Anderson*, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992). All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. *See State v. Pappas*, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Grace*, 493 S.W.2d 474, 476 (Tenn. 1973). Our Supreme Court has stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1966) (citing *Carroll v. State*, 370 S.W.2d 523 (Tenn. 1963)). "A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient." *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982).

In attacking the sufficiency of the evidence as to his convictions, the defendant generally alleges the failures of the police officers and investigators involved in his arrest and their investigation of the crime scenes at issue led to "a botched investigation," and ultimately, to his convictions at trial. In support of his argument, the defendant identifies several alleged failures and/or shortcomings of the investigation, including: (1) that officers did not process the ski mask for DNA evidence which "prevented the State from pursuing other leads in its investigation;" (2) that officers were unable to explain why the victim's military ID was not present in the initial crime scene photographs but was present in subsequent photographs, alleging "possible tampering/doctoring of the documentation of evidence;" (3) that officers did not find the defendant's fingerprints at the crime scene and failed to dust "important surfaces" in the kitchen and rear entrance of

the victim's apartment which "prevented law enforcement from pursuing potential suspects unrelated to [the defendant];" (4) that officers failed to test the stolen items for fingerprints; (5) that officers failed to search the defendant's cell phone for evidence connecting him to the location of the crime scene, arguing "[s]uch evidence was critical in determining beyond a reasonable doubt whether [the defendant] could have committed the robbery at issue;" (6) that officers failed to record the defendant's "alleged admission to being the 'lookout' to the robbery;" and (7) that officers failed to take "contemporaneous notes" of their investigations. For the reasons stated below, all of the defendant's arguments fail.

In this case, the defendant was charged with aggravated robbery, aggravated burglary, and employing a firearm during the commission of a dangerous felony. A "[r]obbery is the intentional or knowing theft of property from the person of another by violence or putting the person in fear." Tenn. Code Ann. § 39-13-401. An aggravated robbery is one "[a]ccomplished with a deadly weapon or by display of any article used or fashioned to lead the victim to reasonably believe it to be a deadly weapon." Tenn. Code Ann. § 39-13-402. One commits aggravated burglary by entering a habitation "without the effective consent of the property owner." Tenn. Code Ann. §§ 39-14-401(1)(A); -402(a); -403 (a). Finally, "[i]t is an offense to employ a firearm during the . . . [c]ommission of a dangerous felony." Tenn. Code Ann. § 39-17-1324 (b)(1). One such "dangerous felony" is aggravated burglary. Tenn. Code Ann. § 39-17-1324 (i)(1)(H).

Here, the evidence at trial showed the defendant participated in the aggravated robbery and burglary of the victim during which a firearm was used. The victim testified he woke up bound on his couch with a handgun pointed to the back of his head as men raided his apartment. The men stole the victim's 12-gauge shotgun, AK-47, .22 long rifle, computers, tablets, and his wallet. The morning after the victim's robbery, Ms. Norris stepped on the barrel of a gun as she got out of bed, and later saw the defendant in her apartment with a shotgun, a ski mask, a duffle bag carrying a handgun, and a check with the victim's name on it. She called the police, and they subsequently arrested the defendant outside her apartment. After his arrest, Agent Stewart and Officer Foster heard the defendant state he was the lookout for the robbery. The defendant also told Agent Stewart he received a shotgun, bankcards, military ID, and tablet as payment for his involvement in the crimes. Upon searching Ms. Norris's apartment, officers found the victim's shotgun and ammunition, his military ID, and his "small computer." Officers also found a handgun and a ski mask which were attributed to the defendant and his participation in the crimes against the victim.

In support of his insufficiency argument, the defendant relies on an alleged "botched investigation" to dispute the above outlined evidence. We, however, find his arguments unpersuasive as the alleged failures of the investigation do not overcome the

overwhelming amount of direct and circumstantial evidence produced by the State in support of these convictions. Furthermore, the defendant argued his alleged "botched investigation" theory to the jury in its cross-examination of the witnesses at trial. Based on the verdicts, the jury weighed the testimony of the officers and investigators regarding the alleged failures of their investigation in relation to the other evidence presented at trial, and reconciled the evidence in favor of the State. This Court will not reweigh the evidence. *State v. Dorantes,* 331 S.W.3d 370, 379 (Tenn. 2011). Accordingly, sufficient evidence exists to show the defendant committed the aggravated robbery and aggravated burglary of the victim while employing a firearm. The defendant is not entitled to relief.

## II.    *Sentencing*

The defendant also argues the trial court erred in sentencing him as a repeat violent offender to life without parole for his aggravated robbery conviction under Tennessee Code Annotated section 40-35-120. "A 'repeat violent offender' is a defendant who: [i]s convicted in this state on or after July 1, 1994, of any offense classified . . . as a violent offense; and [h]as at least two (2) prior convictions for offenses classified in subdivision (b)(1) or (b)(2) as a violent offense." Tenn. Code Ann. § 40-35-120 (a)(1), (2). One qualifying violent offense is aggravated robbery. Tenn. Code Ann. § 40-35-120 (b)(1)(I), (b)(2). The defendant must have served two "separate periods of incarceration for the commission of at least two of the predicate offenses" before the present violent offense qualifies him as a repeat violent offender. Tenn. Code Ann. § 40-35-120 (e)(1)(A). The trial court shall sentence defendants qualifying as repeat violent offenders to a life sentence without the possibility of parole. Tenn. Code Ann. § 40-35-120 (g). However, "[b]efore imposing this sentence, the trial court must find, beyond a reasonable doubt, that the defendant meets the requirements to be declared a repeat violent offender." *State v. Patterson*, 538 S.W.3d 431, 439 (Tenn. 2017) (citing Tenn. Code Ann. § 40-35-120 (g)).

To comply with the repeat violent offender statute, the State must provide notice to the defendant by filing a statement "that the defendant is a repeat violent offender" within forty-five days of the defendant's arraignment. Tenn. Code Ann. § 40-35-120 (i)(2). "The statement . . . shall set forth the dates of the prior periods of incarceration, as well as the nature of the prior conviction offenses." "A notice that fails to provide the defendant with any of the statutorily required relevant information is not fair notice and is insufficient." *State v. Patterson*, 538 S.W.3d 431, 442 (Tenn. 2017) (citing *State v. Adams*, 788 S.W.2d 557, 559 (Tenn. 1990)). However, "if the content of the State's notice substantially complies with the statutory requirements, 'an accused has a duty to inquire about an ambiguous or incomplete notice and must show prejudice to obtain relief.'" *Id.* (quoting *Adams*, 788 S.W.2d at 559).

Here, the defendant challenges the sufficiency of the State's notice, arguing the notice "makes it impossible on its face to determine whether [the defendant's] prior [a]ggravated [r]obbery convictions were in fact two separate periods of incarceration as required by the statute." This argument, however, is without merit.

In sentencing the defendant as a repeat violent offender for his aggravated robbery conviction, the trial court relied on the "Notice of Defendant's Status as a Repeat Violent Offender" filed by the State. The State's notice listed two prior sentences for aggravated robbery convictions entered on January 24, 1997 and April 25, 2002 in the Shelby County Criminal Court. The notice listed the sentences as eight years and twelve years, respectively. In support of his claim, the defendant asserts the State's notice is insufficient in that it failed to list "the exact day, month, and year that [the defendant] went to prison and the dates he was released."

The trial court addressed the defendant's argument in its order denying the defendant's motion for new trial, stating:

> The [d]efendant finally asserts that the State's notice under T.C.A. 40-35-120 was deficient for failing to assert the dates of incarceration. Pursuant to T.C.A. 40-35-120(e)(1)(A), there must be at least two prior separate periods of incarceration to qualify as a repeat violent offender. Included in the notice provided by the state were the dates of conviction and the length of the sentence. It appears that the notice given is that the [d]efendant was convicted of four counts of aggravated robbery in Shelby County on January 24, 1997 and sentenced to eight years. The [d]efendant was then subsequently convicted of one count of aggravated robbery in Shelby County on April 25, 2002 and sentenced to twelve years. The [c]ourt finds that this sufficiently satisfies the notice requirement.

Our review of the record mirrors that of the trial court. Per the State's notice, the defendant received an eight-year sentence for four aggravated robbery convictions on January 24, 1997. He then received a twelve-year sentence for the aggravated robbery conviction of April 25, 2002. As explained above, the State's timely notice makes clear the defendant served two prior, separate periods of confinement for five separate aggravated robbery convictions, thus satisfying the requirements of the repeat violent offender statute within the context of his present aggravated robbery conviction. Tenn. Code Ann. § 40-35-120 (a)(1), (a)(2), (b)(1)(I), (b)(2). Accordingly, the defendant's challenge to the sufficiency of the notice, in that it failed "to note the exact dates of incarceration," fails, and the defendant is not entitled to relief.

Additionally, in support of this argument, the defendant asserts the trial court erred in sentencing him as a repeat violent offender because he was not tried within 180 days of arraignment as required by statute. Tenn. Code Ann. § 40-35-120 (i)(1)(A). However, the repeat violent offender statute makes clear "[a] charge as a repeat violent offender shall be tried within one hundred eighty (180) days of the arraignment on the indictment pursuant to Rule 10 of the Tennessee Rules of Criminal Procedure unless delay is caused by . . . [t]he defendant." Tenn. Code Ann. § 40-35-120 (i)(1)(A)(i).

In its denial of the defendant's motion for new trial, the trial court noted:

> Although the three strikes law typically mandates the commencement of a jury trial within 180 days of arraignment, delay is permitted if due to good cause or if the delay is caused by the defendant. This [c]ourt found on the record at the sentencing hearing that the delay was caused by the [d]efendant's actions which resulted in the need to appoint multiple attorneys. The [d]efendant hired one attorney and was appointed a further five (sic), culminating in . . . trial counsel. In each request to withdraw, every attorney cited (among other reasons), a poor relationship with the [d]efendant. This issue is without merit.

Again, we agree with the trial court's assessment of the defendant's claim. The defendant was arraigned on March 6, 2013 and tried on February 22-23, 2016. As evidenced by four motions to withdraw in the record, the only reason for any alleged delay in this case relates to the defendant's issues with his numerous trial counsel. Though more than 180 days passed between arraignment and trial, nothing in the record indicates the delay occurred for any reason other than that of the defendant. Tenn. Code Ann. § 40-35-120 (i)(1)(A)(i). Accordingly, the record supports the trial court's sentencing of the defendant as a repeat violent offender to a life sentence without the possibility of parole for his aggravated robbery conviction. The defendant is not entitled to relief.

III.     *Failure to Pronounce Sentences for the Defendant's Aggravated Burglary and Employing a Firearm Convictions of Counts 1 and 3.*

Our review of the record reveals the trial court failed to separately sentence the defendant for his convictions in Counts 1 and 3. As evidenced by the judgment forms, the defendant received separate, fifteen-year sentences for his convictions for aggravated burglary and employing a firearm during the commission of a dangerous felony. Additionally, the judgment forms indicate the trial court sentenced the defendant as a career offender for these convictions. Though the judgment forms reflect the individual sentences imposed for each conviction, the trial court failed to articulate the same at the

sentencing hearing.  Rather, at the hearing, the trial court focused primarily on imposing a sentence in Count 2 under the repeat violent offender statute.  In doing so, the trial court failed to pronounce the defendant's sentences for his convictions in Counts 1 and 3 altogether.  The defense made a subsequent, and brief, sentencing correction announcement on August 31, 2017, stating, "After speaking with the State, the State has executed corrected judgments on the aggravated burglary count and the [c]rooks with [g]uns count to reflect that he is career on each count, I think 15 and 12 at 60."  No further pronouncements were made by the trial court as to the sentences imposed for Counts 1 and 3.[2]

The trial court must state on the record the statutory factors it considered and the reasons for the ordered sentence.  Tenn. Code Ann. § 40-35-210 (e); *State v. Bise*, 380 S.W. 3d 682, 705-06 (Tenn. 2012).  Further, "[t]he record of the sentencing hearing is part of the record of the case and shall include specific findings of fact upon which application of the sentencing principles was based."  Tenn. Code Ann. § 40-35-209 (c). The trial court failed to articulate the individual sentences for Counts 1 and 3, and the record is absent a written order outlining the same.  Tenn. Code Ann. § 40-35-210 (a)-(d); *see also State v. Gauldin*, 737 S.W.2d 795, 798 (Tenn. Crim. App. 1987).  Because the trial court failed to comply with Tennessee Code Annotated section 40-35-210, we must remand this case to the trial court for a hearing on the issue of sentencing for Counts 1 and 3.

## CONCLUSION

Based on the foregoing authorities and reasoning, we affirm in part and reverse in part the judgments of the trial court.

_____
J. ROSS DYER, JUDGE

---

[2] We also note the judgment forms actually reflect fifteen-year sentences for the convictions in Counts 1 and 3, a twelve-year sentence was not imposed.